STATE OF MAINE                                    SUPERIOR COURT
YORK, SS.                                         CIVIL ACTION
                                                  DOCKET NO. CV-14-22


VERMONT MUTUAL INSURANCE
COMPANY,

Plaintiff,

v.                                                **Rule 52 Order**

JOSHUA FRANCOEUR,

Defendant,


JONATHAN BEN-AMI,

Party-in-interest.


The Plaintiff Vermont Mutual has moved pursuant to Rule 52 for additional findings of fact. The motion is opposed. The court notes at the outset that the purpose of a Rule 52 Motion is to insure that there are adequate factual findings to allow effective appellate review. *See e.g. Miele v. Miele 2003 ME 113, 832 A.2d 760.* The judgment in this case contains such adequate findings. While acknowledging the dictates in *Wandeshin v. Wandeshin 2009 ME 73, 976 A.2d 949,* the court responds as follows:

The policy language at issue relates to Mr. Francouer's subjective intent. The policy language did not include an exclusion for bodily injury that should have been reasonably expected by an insured.

1

The court concurs with Vermont Mutual that this episode began with a dispute at a Thornton Academy football game. There was planning by Mr. Francouer along with his friends Zack Woolbert and Dylan Morse as to how to attack Mr. Ben-Ami . Just prior to the actual attack Mr. Francouer had second thoughts about going through with it and had to be encouraged by Mr. Morse before he decided into the classroom and strike Mr. Ben-Ami. Mr. Francouer struck Mr. Ben-Ami at least 2 to 3 times with a closed fist and did so at a time when Mr. Ben-Ami was wearing headphones and was likely unaware he was imminently going to be assaulted.

As the court indicated in the judgment , Mr. Francouer intended to strike Mr. Ben-Ami multiple times in the face with a closed fist. The court however also concludes that Mr. Francouer was not actively or consciously considering the extent of damage he could and ultimately did cause. The court concludes that at the actual time of the assault his thinking was likely reflective of the words of Mr. Morse about how the assault would gain him social respect and was not considering the extent of actual damage his actions would cause.

The court further agrees with Vermont Mutual's assertions that even though diagnosed with ADHD, Mr. Francouer even when not medicated had the ability to control his actions. Mr. Francouer did not engage in other fights with other students while unmedicated and did choose the time of the attack. He intended to punch Mr. Ben –Ami. What the court cannot conclude is that at the time of the assault, he subjectively considered or intended the extent of the damage he could and did cause.

2

On residence, the court considered each of the *Dechert* factors and decided that a reasonable policy owner who had legal parental rights and obligations regarding his son who had previously lived in his home and who had historically split time between his father's and mother's homes would likely have considered that son to be part of the protected insureds in the insurance policy he had purchased.

Vermont Mutual is correct that Josh Francouer engaged in a physical altercation with his father which resulted in Josh leaving the home with no subjective intent to return. Further , Steven Francouer had no subjective intent to allow him to return. Steven did maintain a legal obligation to provide support for Joshua with which he complied. The court was also not persuaded that if something unforeseen occurred regarding Joshua's mother Steven would not have considered allowing Joshua to return to his home.

The court carefully considered the evidence of the physical confrontation as well as the noted subjective intent of both Steven and Joshua. However the court remains persuaded that the evaluation of the *Dechert* factors in total support the original conclusion on the residence issue.

Finally, the court amends the judgment to reflect that the physical confrontation between Steven and Joshua and Joshua leaving the home of his father of occurred in January 2011,

not January 2010. Likewise the 21 month reference at page 5 of the judgment is corrected to reflect 9 months. [1]

Accordingly, the Rule 52 motion for additional findings of fact and to amend findings of fact is granted in part and denied in part.

The clerk may incorporate this order by reference.

DATE: August 3, 2017

ENTERED ON THE DOCKET ON:_____

_____
John O'Neil, Jr.
Justice, Superior Court

---

[1] The court's review of its trial notes indicated some ambiguity as to this issue. The court reviewed Vermont Mutual's assertion regarding this and requested the clerk specifically inquire via email if both parties agreed the correct date was 2011 which they did.

ALFSC-CV-2014-22

**ATTORNEY FOR PLAINTIFF:**

JAMES POLIQUIN, ESQ.
NORMAN HANSON & DETROY
PO BOX 4600
PORTLAND ME 04112

**PRO SE DEFENDANT:**

JOSHUA FRANCOEUR
109A PLEASANT STREET
SACO ME 04072

**ATTORNEYS FOR DEFENDANT:**

JAMES O'CONNELL, ESQ.
ALICIA CURTIS, ESQ.
BERMAN & SIMMONS PA
PO BOX 961
LEWISTON ME 04243-0961

STATE OF MAINE
YORK, SS.

SUPERIOR COURT
CIVIL ACTION
DOCKET NO. CV-14-22

VERMONT MUTUAL INSURANCE
COMPANY,

              Plaintiff

     v.

**DECLARATORY JUDGMENT**

JOSHUA FRANCOEUR,

              Defendant

JONATHAN BEN-AMI,

              Party-in-interest

Plaintiff Vermont Mutual Insurance Company ("Vermont Mutual") brings this action seeking a declaratory judgment that Joshua Francoeur is not covered by his father's insurance policy.[1] The Court heard evidence at the trial of this matter and has carefully considered the written arguments.

On October 24, 2011, Joshua Francoeur ("Francoeur") hit Jonathan Ben-Ami ("Ben-Ami"). At the time of the incident, Francoeur and Ben-Ami were students at Thornton Academy in Saco. Francoeur and Ben-Ami had a verbal altercation at a Thornton Academy football game several days before the incident.

According to Francoeur, his friend Dylan pressured him to fight Ben-Ami. The Sunday before the incident, Dylan was trying to talk [Francoeur] into going to beat up Jon Ben-Ami.

---

[1] This case has been consolidated with *Jonathan Ben-Ami v. Vermont Mutual Insurance Company*, CV-14-194. The parties agreed to bifurcate these matters for trial.

1

On the morning of the incident, Francoeur left his class. He proceeded to the classroom where Ben-Ami was. When he reached the classroom, his intent was to walk in and hit [Ben-Ami]. The door to Ben-Ami's classroom was locked. Francoeur got the teacher, Jennifer Merry, to open the door to let him in. He then walked past Merry and approached Ben-Ami from behind. He then proceeded to punch Ben-Ami about the face multiple times.

Ben-Ami suffered serious injuries, including a broken jaw. Francoeur had never been involved in a physical fight with another prior to the incident. He was diagnosed with Attention Deficit Hyperactivity Disorder in the first or second grade.

The Vermont Mutual homeowner's insurance policy issued to Josh Francoeur's father Steven Francoeur defines an "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions, which results, during the policy period, in: a. 'Bodily injury' or b. 'Property damage.'" The policy excludes from coverage bodily injury or property damage "[w]hich is expected or intended by the insured . . . ."

### 1. Josh Francoeur's Residence

Soon after Josh Francoeur was born, his mother and father divorced and have lived separately ever since. His mother, Lynn Johnson, has lived at 109A Pleasant Street in Saco, while his father, Steven Francoeur lived at 52 Berry Road in Saco. During adolescence, Josh split his time between his mother and father's home. Upon entering high school, Josh was given the choice of where he wished to live. At the end of freshman year, he moved from his mother's to his father's home, where he lived until January 2010. He moved back to his mother's home in January 2010 after an argument with his father. Josh left personal belongings at his father's home, including a stereo, bracelet, clothes, earrings, and shoes. From January 2010 until after the incident in October 2011, Josh never returned to his father's home to stay or visit. Steven

2

Francoeur told Josh he was not welcome back. Josh did not see his father at all in the seven months preceding the incident. Steven continued to pay child support in the amount of $120 per week for Josh's support.

The Vermont Mutual policy defines "insured" as "you and residents of your household who are: a. Your relatives; or b. Other persons under the age of 21 and in the care of any person named above."

In review of the trial testimony the Court concludes that it is generally consistent with the affidavits that were presented on the motions for summary judgment. The Court found each of the witnesses who testified generally credible. The Court does conclude that Mr. Francoeur likely struck Mr. Ben-Ami multiple times in excess of the one to two times that he testified to at trial.

At the outset with respect to the issues of both residence and intended or expected injuries, the Court notes that there is little definitional assistance in the applicable insurance policy.

The meaning of unambiguous insurance contract language presents a question of law for the court. *Brackett v. Middlesex Ins. Co.*, 486 A.2d 1188, 1189 (Me. 1985). Whether an insurance contract is ambiguous is similarly a question of law. *Peerless Ins. Co. v. Brennon*, 564 A.2d 383, 384 (Me. 1989). An ambiguity arises if the language is reasonably susceptible of different interpretations "or if any ordinary person in the shoes of the insured would not understand that the policy did not cover claims such as those brought." *Pelkey v. GE Capital Assur. Co.*, 2002 ME 142, ¶ 10, 804 A.2d 385. Ambiguities are construed "strictly against the insurer and liberally in favor of the insured." *Id.*

3

As set forth above, the Vermont Mutual policy at issue limits coverage to the policyholder "and residents of your household who are: a. Your relatives; or b. Other persons under the age of 21 and in the care of any person named above." The policy does not define "resident" or "household." In Count One, Vermont Mutual seeks a declaration that because Josh Francoeur was not a "resident" of Steven Francoeur's "household" at the time of the incident, he is not an "insured" within the meaning of the policy.

The Law Court has repeatedly held that the terms "household" and "residence" are ambiguous. The Court has emphasized whether an insured is a member of a household is a highly fact-specific inquiry: "temporary absence may not terminate the status of resident in the household, and much will depend on the subjective or declared intent of the individual. Nor is it essential that the household be housed under a single roof or supported by a single head." *Dechert v. Maine Ins. Guar. Ass'n*, 1998 ME 127, ¶ 9, 711 A.2d 1290; *see also Cambridge Mut. Fire Ins. Co. v. Vallee*, 687 A.2d 956, 957 (Me. 1996) (collecting cases that described "reside" and "residence" in terms such as "chameleon-like" and a "slippery eel" of ambiguity).

In *Dechert*, the Law Court set forth the following considerations to determine whether the party could be a resident of the household at issue: (1) subjective or declared intent when the claimant moved; (2) the nature of the claimant's tenancy; (3) claimant's belongings left; (4) the claimant's practice in regard to returning home; (5) whether the claimant retained a key; (6) the claimant's financial dependence on the primary policy holder. 1998 ME 127, ¶ 9, 711 A.2d 1290.

Consistent with its Motion for Summary Judgment Vermont Mutual argued at trial that Francoeur effectively abandoned his residency in his father's home. In particular, Vermont Mutual emphasizes (1) Francoeur left the home after the fight with his father, (2) as a result of the fight, Francoeur's departure and failure to return expressed his intention to leave and not

4

return, (3) he lived continuously at his mother's for the following twenty-one months leading up to the incident, (4) he did not return to his father's residence at any time, (5) he did not speak to his father at all during the seven months leading up to the incident, and (6) he resided with his mother as of June 2014.

The Court concludes that Francoeur split his time between his mother's and father's home while he was growing up and was allowed a choice when he entered high school. He moved back and forth to both residences. Francoeur did move to his mother's home for twenty-one months after the fight with his father in January 2010, but he left a number of personal belongings behind, including a stereo, bracelet, clothes, earrings, and shoes. During this time, Steven Franceour continued to pay child support for his son's benefit and remained legally responsible for him.

*Dechert* establishes the rule that "[n]o one factor is, in itself, determinative; instead, each factor must be balanced and weighed with the others." 1998 ME 127, ¶ 9, 711 A.2d 1290. Weighing the facts in total the Court concludes that for purposes of this policy Josh Francoeur remained a resident of his father's household and thus covered under the policy.

Although there was a rift between Josh and his father at the time of his moving out, and it was clear that neither subjectively intended that Josh would be returning to the premises, the Court does not view that as determinative of the issue of whether or not he was a resident of his father's home for the purpose of insurance coverage.

In evaluating the *Dechert* factors the Court is persuaded that an objectively reasonable policyholder, such as Mr. Franceour would have considered his son to have been covered by the policy as a resident of his household. The Court is persuaded by the following facts. Steven Franceour was the father of Joshua Franceour, and as such had a lawful obligation to provide

5

support to him. He had purchased the policy and renewed it several times when his son had alternatively lived between his father's and his mother's house. An objective policyholder would likely have concluded that his son who had the lawful right to reside with him and had done so in the past would have been covered by this insurance policy. Clearly the language in this policy would not allow an objectively reasonable policyholder to believe that coverage would be dependent upon the whims of a teenager who was alternatively deciding to live with either his mother or his father during the course of his minority. The fact that it appeared that this rift was likely going to be permanent, because of the serious nature of the dispute, does not outweigh these considerations.

Vermont Mutual next argues that there is no coverage because the incident was not an "occurrence" within the meaning of the policy. The policy defines an "occurrence" as "an accident."

Vermont Mutual concedes that "the 'accidental' nature of an event for purposes of a standard liability insurance contract . . . does not derive from the voluntariness of the act, but rather from the unintentional nature of the consequences flowing from the act." *Me. Mut. Fire Ins. Co. v. Gervais*, 1998 ME 197, ¶ 10, 715 A.2d 938 (citations omitted). Notwithstanding acknowledgement of *Gervais*, Vermont Mutual argues that the incident was not an accident because Ben-Ami's injuries were so certain to occur that the consequences were known and expected by Francoeur as a matter of law. Francoeur, however, maintains that he did not subjectively intend to serious injure Ben-Ami or break his jaw, even if the act itself was intentional. The Court concludes that to be likely.

The Vermont Mutual policy excludes from coverage bodily injury or property damage "[w]hich is expected or intended by the insured . . . ." Vermont Mutual argues that even if

6

Francoeur is an insured and the incident was an occurrence, because Francoeur expected or intended the bodily injury inflicted on Ben-Ami, the exclusion applies and precludes coverage.

In *Patrons-Oxford Mutual Insurance Company v. Dodge*, the insured shot a man with a shotgun, was charged with aggravated assault, and was found guilty. 426 A.2d 888, 889 (Me. 1981). The insurer brought suit seeking a declaratory judgment that pursuant to an intentional loss exclusion in Dodge's insurance policy, there was no duty to defend Dodge in a civil suit by the victim. *Id.* at 890. The exclusion stated: "This policy does not apply . . . to bodily injury or property damage which is either expected or intended from the standpoint of the Insured." *Id.* at 889.

The Law Court found "expected or intended from the standpoint of the Insured" ambiguous, and following rules of construction favoring coverage, held the exclusion "refers only to bodily injury that the insured in fact subjectively wanted ('intended') to be a result of his conduct or in fact subjectively foresaw as practically certain ('expected') to be a result of his conduct." *Dodge*, 426 A.2d at 892. In other words, the insured must not only intend the act, but also subjectively intend to cause the harm that flows from the act. Applying this rule to Dodge's conduct, the Court noted a "reckless" state of mind could have supported the underlying assault charge. *Id.*[2] The Court concluded that such a result does not show Dodge's conscious purpose was to cause harm when he shot the gun. The harm was therefore not "expected or intended from the standpoint of the insured." *Id.*

The Law Court has since reaffirmed the holding of *Dodge. See Royal Insurance Company v. Pinette*, 2000 ME 155, ¶ 8, 756 A.2d 520 ("Our cases . . . demonstrate that [an

---

[2]     Recklessness as a culpable state of mind is defined as a conscious disregard of a risk a person's conduct will cause a result 17-A M.R.S.A. §35.

7

intentional bodily injury] exclusion applies only when the insured has acted with the intention or expectation that another will be harmed by the insured's intentional act.")

Like the "occurrence" argument, Vermont Mutual's intentional loss exclusion argument endorses a "natural and probable consequences of one's act" approach to Francoeur's conduct. While hitting a person in the face would seem substantially certain to cause harm, with harm a natural and probable consequence, a number of courts have rejected insurer's invitations to apply such an objective inquiry. *See, e.g.*, *Sans v. Monticello Ins. Co.*, 676 N.E.2d 1099, 1103 (Ind. Ct. App. 1997) ("Indiana does not endorse the 'natural consequences of the act' rule requiring the inference of intent as a matter of law."); *Allstate Ins. Co. v. Stone*, 876 P.2d 313, 315 (Or. 1994) ("This court has rejected the objective 'natural and ordinary' consequences approach to applying exclusions for intentionally-inflicted harms."); *Providence Mut. Fire Ins. Co. v. Scanlon*, 638 A.2d 1246, 1248 (N.H. 1994) (refusing to adopt objective substantial certainty test for whether injury was intended). These cases all follow the rule that the actor must subjectively intend the harm, not just intend the act and the consequences that would likely flow from the act. *See Dodge*, 426 A.2d at 892.

This is not to say an insured is entitled to coverage so long as they assert a subjective belief that their conduct, no matter how egregious, would not cause the harm. Certain crimes carry with them such predictable or certain harms that intentional loss exclusions have been held to apply as a matter of law. *See, e.g.*, *Perreault v. Maine Bonding & Cas. Co.*, 568 A.2d 1100, 1101 (Me. 1990) (holding conviction for unlawful sexual contact requires the actor make contact "for the purpose of arousing or gratifying sexual desire" sufficient to establish the insured expected or intended injury); *State Mut. Ins. Co. v. Bragg*, 589 A.2d 35, 38 (Me. 1991) ("We hold on the facts of the instant case that murder and attempted murder are crimes in which the

8

intent to cause, or the expectation of causing injury inheres."); *Mut. Fire Ins. Co. v. Hancock*, 634 A.2d 1312, 1312 (Me. 1993) (brutally beating and raping victim for several hours, although intoxicated, held sufficient to intend injury such that exclusion applied); *Landry v. Leonard*, 1998 ME 241, ¶¶ 9-10, 720 A.2d 907 (holding "harm was so likely to occur during an armed robbery with a knife that the intention and expectation of injury was inherent as a matter of law in the commission of the crime").

Under these precedents, convictions for sexual abuse of a minor, murder, rape, and armed robbery were held to be crimes that resulted in harms that were expected or intended. In each case, however, the actor's underlying criminal conviction established a *mens rea* that prevented the claimant from re-litigating the intent issue in the subsequent civil suit.

It is settled law that exclusions for physical injuries that are expected or intended by the insured require the actor subjectively intend the harm, *Pinette*, 2000 ME 155, 8, 756 A.2d 520, and as here, the policy in *Pinette* excluded "'bodily injury' . . . which is expected or intended by the 'insured' . . . ." *Id.* ¶ 2 n.2.[3] The Court concludes that Francoeur did not subjectively expect or intend the broken jaw to Ben-Ami.

After evaluation of all of the testimony in this case, the Court does conclude that it was Mr. Francoeur's subjective intent to strike Mr. Ben-Ami on multiple occasions in the face. The Court however cannot conclude that he subjectively intended to inflict the level of damage that ultimately was inflicted upon Mr. Ben-Ami in the form of his broken jaw. Mr. Francoeur's testimony that he did not consider the consequences of his action, or consider the likelihood that his punching of Mr. Ben-Ami would produce such a serious injury is credible. The policy

---

[3] While the Superior Court (Cumberland County, *Warren*, J.) recently distinguished *Dodge* and held that an intentional loss exclusion applied where the claimant committed an assault, the policy in that case excluded "intentional . . . acts . . . even if . . . such bodily injury is of a different kind or degree than reasonably expected or intended by you." *Metro. Prop. & Cas. Ins. Co. v. Googins*, CV-13-102, 2014 Me. Super. LEXIS 228, *6 (Oct. 31, 2014). The Vermont Mutual policy contains no such language.

9

language in this case this Court interprets as requiring a subjective level of intent to cause the damage that was ultimately caused to Mr. Ben-Ami. If the language in this policy included exclusion for injury that should be reasonably expected as a result of conduct, this result would have been different. That however is not the policy language.

## II. Conclusion

The entry shall be:

The Court accordingly declares that Joshua Francoeur was a resident of his father's household at the time of this incident as that term is used in the policy. His actions are not excluded by the policy definition of occurrence nor the intentional act exclusion as defined in this specific policy.

DATE: April 18, 2017

ENTERED ON THE DOCKET ON: 4/18/17

_____
John H. O'Neil, Jr.
Justice, Superior Court

4/18/2017 In light of decision, counsel to confer and notify clerk of proposed plan regarding CV-14-194, if not in agreement, counsel may request Telephonic conference

JHO

10

## CV-2014-22

**ATTORNEY FOR PLAINTIFF:**

JAMES POLIQUIN, ESQ.
NORMAN HANSON & DETROY, LLC
PO BOX 4600
PORTLAND ME 04112-4600

**PRO SE DEFENDANT:**

JOSHUA FRANCOEUR
109A PLEASANT STREET
SACO ME 04072

**PARTY-IN-INTEREST ATTORNEY:**

JAMES E. O'CONNELL, ESQ.
ALICIA CURTIS, ESQ.
BERMAN & SIMMONS, P.A.
PO BOX 961
LEWISTON ME 04243-0961

STATE OF MAINE                                    SUPERIOR COURT
YORK, SS.                                         CIVIL ACTION
                                                  DOCKET NO. CV-14-22
                                                  CV-14-194

VERMONT MUTUAL INSURANCE
COMPANY,

Plaintiff,

v.                                                **ORDER**

JOSHUA FRANCOEUR,

Defendant,

JONATHAN BEN-AMI,

Party-in-interest.

## I. Background

### A. Procedural Posture

Plaintiff Vermont Mutual Insurance Company ("Vermont Mutual") brings this action seeking a declaratory judgment that Joshua Francoeur is not covered by his father's insurance policy.[1] Vermont Mutual moves for summary judgment.

### B. Facts

#### 1. The Incident

On October 24, 2011, Joshua Francoeur ("Francoeur") hit Jonathan Ben-Ami ("Ben-Ami"). (Pl.'s S.M.F. ¶ 31.) At the time of the incident, Francoeur and Ben-Ami were students at Thornton Academy in Saco. Francoeur struck Ben-Ami because Ben-

---

[1] This case has been consolidated with *Jonathan Ben-Ami v. Vermont Mutual Insurance Company*, CV-14-194.

1

Ami had apparently asked for Francoeur's ex-girlfriend's phone number. (Id. ¶ 24.) This "bothered" and "upset" Francoeur. (Def.'s Opp. S.M.F. ¶ 24.) Francoeur and Ben-Ami had a verbal altercation at a Thornton Academy football game several days before the incident. (Id. ¶ 25.)

According to Francoeur, his friend Dylan pressured him to fight Ben-Ami. The Sunday before the incident, Dylan was "trying to talk [Francoeur] into going to beat up Jon Ben-Ami." (Def.'s Opp. S.M.F. ¶ 23.) The morning of the incident, Dylan slapped Francoeur on the back of the neck in an effort to get him pumped up to fight Ben Ami, but Francoeur testified "I didn't want to do it. I kept saying, I don't know if this is a good idea, and he just kept talking to me and said that no one would like me if I didn't do it." (Id. ¶ 26.) Francoeur stated that without Dylan's encouragement, he would not have hit Ben-Ami. (Def.'s Add'tl S.M.F. ¶ 38.)

On the morning of the incident, Dylan got Francoeur out of class. The two proceeded to the classroom where Ben-Ami was. When they reached the classroom, Francoeur developed a plan to "walk in and hit [Ben-Ami] and then just walk out." (Pl.'s S.M.F. ¶ 29.) The door to Ben-Ami's classroom was locked. Francoeur got the teacher, Jennifer Merry, to open the door to let him in. He then walked past Merry and approached Ben-Ami from behind. In Francoeur's words, "I hit John and then he fell to the ground and then I walked away." (Def.'s Opp. S.M.F. ¶ 32.)[2] Francoeur voluntarily stopped once Ben-Ami fell to the floor. (Def.'s Add'tl S.M.F. ¶¶ 39-40.)

Ben-Ami suffered serious injuries, including a broken jaw. Francoeur did not intend to cause serious, painful, long-term injuries or to break Ben-Ami's jaw. (Def.'s

---

[2] In an affidavit, Merry asserts that Francoeur punched Ben-Ami "multiple times in the face with a closed fist." (Merry Aff. ¶ 6.) Francoeur did not specify how many times he hit Ben-Ami, although his testimony appears to imply it was more than once. (Francoeur Dep. 64-65.)

2

Add'tl S.M.F. ¶¶ 31, 33.) Francoeur had never been involved in a physical fight with another prior to the incident. (Id. ¶ 34.) He was diagnosed with Attention Deficit Hyperactivity Disorder in the first or second grade and maintains that his condition sometimes prevented him from controlling his behavior. (Id. ¶¶ 19, 25.) Francoeur testified his ADHD causes him to acted impulsively and he acted impulsively when he hit Ben-Ami. (Id. ¶¶ 27-28.)

The Vermont Mutual homeowner's insurance policy issued to Josh Francoeur's father Steven Francoeur defines an "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions, which results, during the policy period, in: a. 'Bodily injury' or b. 'Property damage.'" (Pl.'s S.M.F. ¶ 21.) The policy excludes from coverage bodily injury or property damage "[w]hich is expected or intended by the insured . . . ." (Id. ¶ 22.)

### 2. Josh Francoeur's Residence

Soon after Josh Francoeur was born, his mother and father divorced and have lived separately ever since. (Pl.'s S.M.F. ¶¶ 6-8.) His mother, Lynn Johnson, has lived at 109A Pleasant Street in Saco, while his father, Steven Francoeur lived at 52 Berry Road in Saco. (Id. ¶¶ 9-10.) During adolescence, Josh split his time between his mother and father's home. (Id. ¶ 11.) Upon entering high school, Josh was given the choice of where he wished to live. (Id. ¶ 12.) At the end of freshman year, he moved from his mother's to his father's home, where he lived until January 2010. (Id. ¶ 14.) He moved back to his mother's home in January 2010 after an argument with his father. (Def.'s Add'tl S.M.F. ¶ 4.) Josh left personal belongings at his father's home, including a stereo, bracelet, clothes, earrings, and shoes. (Def.'s Opp. S.M.F. ¶ 16.) When Josh left, he testified "I just

3

grabbed what I could out of my room . . . I didn't really grab everything I needed, just the essentials, what I could grab." (Id. ¶ 17.) There was never any direct communication between Josh and his father that Josh intended to move out. (Id.) From January 2010 until after the incident in October 2011, Josh never returned to his father's home to stay or visit. (Pl.'s S.M.F. ¶ 18.) Steven Francoeur told Josh he was not welcome back in order to discipline Josh for not respecting the rules of his household and to stop Josh from moving back and forth to evade rules. (Def.'s Add'tl S.M.F. ¶ 8.) Josh did not see his father at all in the seven months preceding the incident. (Pl.'s S.M.F. ¶ 19.) Steven continued to pay child support in the amount of $120 per week for Josh's support. (Def.'s Add'tl S.M.F. ¶ 9.)

The Vermont Mutual policy defines "insured" as "you and residents of your household who are: a. Your relatives; or b. Other persons under the age of 21 and in the care of any person named above." (Pl.'s S.M.F. ¶ 5.)

## II. Discussion

### A. Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits . . . show that there is no genuine issue as to any material fact . . . and that any party is entitled to a judgment as a matter of law." M.R. Civ. P. 56(c). "Even when one party's version of the facts appears more credible and persuasive to the court, any genuine factual dispute must be resolved through fact-finding, regardless of the nonmoving party's likelihood of success." *Lewis v. Concord Gen. Mut. Ins. Co.*, 2014 ME 34, ¶ 10, 87 A.3d 732. Summary judgment is

4

plainly not available "when [material] facts or reasonable inferences to be drawn from the facts are in dispute." *Rose v. Parsons*, 2015 ME 73, ¶ 4, __ A.2d __.

The meaning of unambiguous insurance contract language presents a question of law for the court. *Brackett v. Middlesex Ins. Co.*, 486 A.2d 1188, 1189 (Me. 1985). Whether an insurance contract is ambiguous is similarly a question of law. *Peerless Ins. Co. v. Brennon*, 564 A.2d 383, 384 (Me. 1989). An ambiguity arises if the language is reasonably susceptible of different interpretations "or if any ordinary person in the shoes of the insured would not understand that the policy did not cover claims such as those brought." *Pelkey v. GE Capital Assur. Co.*, 2002 ME 142, ¶ 10, 804 A.2d 385. Ambiguities are construed "strictly against the insurer and liberally in favor of the insured." *Id.*

## B. Count One: Residency

As set forth above, the Vermont Mutual policy at issue limits coverage to the policyholder "and residents of your household who are: a. Your relatives; or b. Other persons under the age of 21 and in the care of any person named above." (Pl.'s S.M.F. ¶ 5.) The policy does not define "resident" or "household." In Count One, Vermont Mutual seeks a declaration that because Josh Francoeur was not a "resident" of Steven Francoeur's "household" at the time of the incident, he is not an "insured" within the meaning of the policy.

The Law Court has repeatedly held that the terms "household" and "residence" are ambiguous. The Court has emphasized whether an insured is a member of a household is a highly fact-specific inquiry: "temporary absence may not terminate the status of resident in the household, and much will depend on the subjective or declared

5

intent of the individual. Nor is it essential that the household be housed under a single roof or supported by a single head." *Dechert v. Maine Ins. Guar. Ass'n*, 1998 ME 127, ¶ 9, 711 A.2d 1290; *see also Cambridge Mut. Fire Ins. Co. v. Vallee*, 687 A.2d 956, 957 (Me. 1996) (collecting cases that described "reside" and "residence" in terms such as "chameleon-like" and a "slippery eel" of ambiguity).

In *Dechert*, the Law Court set forth the following considerations to determine whether the party could be a resident of the household at issue: (1) subjective or declared intent when the claimant moved; (2) the nature of the claimant's tenancy; (3) claimant's belongings left; (4) the claimant's practice in regard to returning home; (5) whether the claimant retained a key; (6) the claimant's financial dependence on the primary policy holder. 1998 ME 127, ¶ 9, 711 A.2d 1290.

Vermont Mutual argues that Francoeur effectively abandoned his residency in his father's home. In particular, Vermont Mutual emphasizes (1) Francoeur left the home after the fight with his father, (2) as a result of the fight, Francoeur's departure and failure to return expressed his intention to leave and not return,[3] (3) he lived continuously at his mother's for the following twenty-one months leading up to the incident, (4) he did not return to his father's residence at any time, (5) he did not speak to his father at all during the seven months leading up to the incident, and (6) he resided with his mother as of June 2014. (Pl.'s Mot. Summ. J. 7-8.)

The above facts are probative of whether Francoeur intended to abandon his residency at his father's household. They do not, however, paint the entire picture. The

---

[3] Vermont Mutual has not put forth a statement of fact asserting that Francoeur made any affirmative representation that he did not intend to return. To the extent this is an inference drawn from the circumstances, Vermont Mutual, as the moving party, is not entitled to it on summary judgment.

6

summary judgment record also establishes that Francoeur split his time between his mother and father's home while he was growing up and was allowed a choice when he entered high school. (Pl.'s S.M.F. ¶¶ 11-12.) He moved back and forth without residing permanently in either residence. While he moved to his mother's home for twenty-one months after the fight with his father in January 2010, he left a number of personal belongings behind, including a stereo, bracelet, clothes, earrings, and shoes. (Def.'s Opp. S.M.F. ¶ 16.) There was no forethought or affirmative intention to abandon his possessions and never return; the decision was made in the heat of the fight and Francoeur left abruptly. (Id. ¶ 17.) Francoeur never affirmatively represented that he did not intend to return and did not tell his father he was moving out. (Id.) During this time, Steven Franceour continued to pay child support for his son's benefit. (Def.'s Add'tl S.M.F. ¶ 9.)

Vermont Mutual emphasizes the intensity of the rift between Josh and his father and in particular the duration of time establishes as a matter of law that at the time of the incident, Josh no longer resided there. This position is undermined by the facts above and ignores the rule that "[n]o one factor is, in itself, determinative; instead, each factor must be balanced and weighed with the others." *Dechert*, 1998 ME 127, ¶ 9, 711 A.2d 1290. Weighing the facts and drawing all reasonable inferences in favor of the non-moving party, there is a disputed issue of material fact regarding whether Josh Francoeur was a resident of his father's household and thus covered under the policy. Summary judgment on Count One is denied.

### C. Count Two: Occurrence

7

Vermont Mutual next argues that there is no coverage because the incident was not an "occurence" within the meaning of the policy. The policy defines an "occurrence" as "an accident." (Pl.'s S.M.F. ¶ 21.)

Vermont Mutual concedes that "the 'accidental' nature of an event for purposes of a standard liability insurance contract . . . does not derive from the voluntariness of the act, but rather from the unintentional nature of the consequences flowing from the act." *Me. Mut. Fire Ins. Co. v. Gervais*, 1998 ME 197, ¶ 10, 715 A.2d 938 (citations omitted). Notwithstanding acknowledgement of *Gervais*, Vermont Mutual argues that the incident was not an accident because Ben-Ami's injuries were so certain to occur that the consequences were known and expected by Francoeur as a matter of law. Francoeur, however, maintains that he did not subjectively intend to serious injure Ben-Ami or break his jaw, even if the act itself was intentional. (Def.'s Add'tl S.M.F. ¶¶ 31, 33.) Summary judgment on Count Two must therefore be denied.

### D. Count Three: The Intentional Loss Exclusion

The Vermont Mutual policy excludes from coverage bodily injury or property damage "[w]hich is expected or intended by the insured . . . ." (Pl.'s S.M.F. ¶ 22.) Vermont Mutual argues that even if Francoeur is an insured and the incident was an occurrence, because Francoeur expected or intended the bodily injury inflicted on Ben-Ami, the exclusion applies and precludes coverage.

In *Patrons-Oxford Mutual Insurance Company v. Dodge*, the insured shot a man with a shotgun, was charged with aggravated assault, and was found guilty. 426 A.2d 888, 889 (Me. 1981). The insurer brought suit seeking a declaratory judgment that pursuant to an intentional loss exclusion in Dodge's insurance policy, there was no duty

8

to defend Dodge in a civil suit by the victim. *Id.* at 890. The exclusion stated: "This policy does not apply . . . to bodily injury or property damage which is either expected or intended from the standpoint of the Insured." *Id.* at 889.

The Law Court found "expected or intended from the standpoint of the Insured" ambiguous, and following rules of construction favoring coverage, held the exclusion "refers only to bodily injury that the insured in fact subjectively wanted ('intended') to be a result of his conduct or in fact subjectively foresaw as practically certain ('expected') to be a result of his conduct." *Dodge*, 426 A.2d at 892. In other words, the insured must not only intend the act, but also subjectively intend to cause the harm that flows from the act. Applying this rule to Dodge's conduct, the Court noted a "reckless" state of mind could have supported the underlying assault charge. *Id.* The Court concluded that such a result does not show Dodge's conscious purpose was to cause harm when he shot the gun. The harm was therefore not "expected or intended from the standpoint of the insured." *Id.*

The Law Court has since reaffirmed the holding of *Dodge*. *See Royal Insurance Company v. Pinette*, 2000 ME 155, ¶ 8, 756 A.2d 520 ("Our cases . . . demonstrate that [an intentional bodily injury] exclusion applies only when the insured has acted with the intention or expectation that another will be harmed by the insured's intentional act.")

Like the "occurrence" argument, Vermont Mutual's intentional loss exclusion argument endorses a "natural and probable consequences of one's act" approach to Francoeur's conduct. While hitting a person in the face would seem substantially certain to cause harm, with harm a natural and probable consequence, a number of courts have rejected insurer's invitations to apply such an objective inquiry. *See, e.g., Sans v. Monticello Ins. Co.*, 676 N.E.2d 1099, 1103 (Ind. Ct. App. 1997) ("Indiana does not

9

endorse the 'natural consequences of the act' rule requiring the inference of intent as a matter of law."); *Allstate Ins. Co. v. Stone*, 876 P.2d 313, 315 (Or. 1994) ("This court has rejected the objective 'natural and ordinary' consequences approach to applying exclusions for intentionally-inflicted harms."); *Providence Mut. Fire Ins. Co. v. Scanlon*, 638 A.2d 1246, 1248 (N.H. 1994) (refusing to adopt objective substantial certainty test for whether injury was intended). These cases all follow the rule that the actor must subjectively intend the harm, not just intend the act and the consequences that would likely flow from the act. *See Dodge*, 426 A.2d at 892.

This is not to say an insured is entitled to coverage so long as they assert a subjective belief that their conduct, no matter how egregious, would not cause the harm. Certain crimes carry with them such predictable or certain harms that intentional loss exclusions have been held to apply as a matter of law. *See, e.g.*, *Perreault v. Maine Bonding & Cas. Co.*, 568 A.2d 1100, 1101 (Me. 1990) (holding conviction for unlawful sexual contact requires the actor make contact "for the purpose of arousing or gratifying sexual desire" sufficient to establish the insured expected or intended injury); *State Mut. Ins. Co. v. Bragg*, 589 A.2d 35, 38 (Me. 1991) ("We hold on the facts of the instant case that murder and attempted murder are crimes in which the intent to cause, or the expectation of causing injury inheres."); *Mut. Fire Ins. Co. v. Hancock*, 634 A.2d 1312, 1312 (Me. 1993) (brutally beating and raping victim for several hours, although intoxicated, held sufficient to intend injury such that exclusion applied); *Landry v. Leonard*, 1998 ME 241, ¶¶ 9-10, 720 A.2d 907 (holding "harm was so likely to occur during an armed robbery with a knife that the intention and expectation of injury was inherent as a matter of law in the commission of the crime").

10

Under these precedents, convictions for sexual abuse of a minor, murder, rape, and armed robbery were held to be crimes that resulted in harms that were expected or intended. In each case, however, the actor's underlying criminal conviction established a *mens rea* that prevented the claimant from re-litigating the intent issue in the subsequent civil suit.

Here, however, Francoeur's intent is at a minimum a disputed issue of material fact. At this stage, there are properly supported facts asserting Francoeur did not intend the harm that flowed from his conduct. (Def.'s Add'tl S.M.F. ¶¶ 31, 33.) It is settled law that exclusions for physical injuries that are expected or intended by the insured require the actor subjectively intend the harm, *Pinette*, 2000 ME 155, 8, 756 A.2d 520, and as here, the policy in *Pinette* excluded "'bodily injury' . . . which is expected or intended by the 'insured' . . . ." *Id.* ¶ 2 n.2.[4] Because Francoeur did not subjectively expect or intend the injury to Ben-Ami, summary judgment must be denied on Count Three.

### III. Conclusion

As set forth above, disputed issues of material fact preclude summary judgment for Vermont Mutual. The motion is denied.

---

[4] While the Superior Court (Cumberland County, *Warren*, J.) recently distinguished *Dodge* and held that an intentional loss exclusion applied where the claimant committed an assault, the policy in that case excluded "intentional . . . acts . . . even if . . . such bodily injury is of a different kind or degree than reasonably expected or intended by you." *Metro. Prop. & Cas. Ins. Co. v. Googins*, CV-13-102, 2014 Me. Super. LEXIS 228, *6 (Oct. 31, 2014). The Vermont Mutual policy contains no such language. In light of the rule that exclusions are to be construed strictly against the insured, Vermont Mutual is not entitled to summary judgment on the grounds the exclusion applies. *Pease v. State Farm Mut. Auto. Ins. Co.*, 2007 ME 134, ¶ 7, 931 A.2d 1072.

11

The entry shall be:

Plaintiff's motion for summary judgment is hereby DENIED.

SO ORDERED.

DATE: August 25, 2015

John O'Neil, Jr.
Justice, Superior Court

CV-14-22
CONSOLIDATED WITH
CV-14-194

ATTORNEY FOR PLAINTIFF IN CASE #CV-14-22
AND FOR DEFENDANT IN CASE CV-14-194
JAMES D POLIQUIN
NORMAN HANSON & DETROY LLC
PO BOX 4600
PORTLAND ME 04112

DEFENDANT JOSHUA FRANCOEUR IN CASE CV-14-22 PRO SE:
JOSHUA FRANCOEUR
109A PLEASANT STREET
SACO ME 04072

ATTORNEYS FOR PARTIES IN INTEREST IN CV-14-22:
WILLIAM ROBITZEK
MAINE LAWYER SERVICES
54 EVERGREEN ROAD
AUBURN ME 04210

ALICIA F CURTIS
JAMES E OCCONNELL III
BERMAN & SIMMONS PA
P O BOX 961
LEWISTON ME 04243

ALICIA AND JAMES ARE ALSO ATTORNEYS FOR PLAINTIFF IN CV-14-194: